UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

TRUNG TRAN,                                        No. C 06-4508 MHP (pr)

           Petitioner,                   **ORDER DENYING PETITION FOR
                                                   WRIT OF HABEAS CORPUS**

     v.

ROBERT A. HOREL, warden,

           Respondent.

_____/

## INTRODUCTION

Trung Tran filed this pro se action seeking a writ of habeas corpus under 28 U.S.C. §
2254. The matter is now before the court for consideration of the merits of the habeas
petition. For the reasons discussed below, the petition will be denied.

## BACKGROUND

The California Court of Appeal described the evidence in this home invasion robbery
case:

> Thao Thi Truong had been staying at a house on Dearwell Way in San Jose with her
> then boyfriend Tien Van Le for two nights prior to October 19, 2000. Late that night,
> there were nine persons in the house, including Lamyai Sae Eiw. Truong and Le were
> eating and watching television in the living room with three others when they heard
> somebody knock on the door. Le went to answer it, and a man put a gun to his head.
> The man covered part of his face with a cloth, and two other men came in with their
> faces covered. The taller of the two other men also had a gun. They yelled for
> everybody to sit down with their hands over their heads. Two men that had been in
> the house ran outside through the garage. The taller man who had come inside with a
> gun ran upstairs, threw down a suitcase, and yelled for its owner to unlock it. He also
> yelled, "Where's the money? If I can't find the money, then somebody is going to get
> shot."
>
> [Tan Van] Nguyen and a women came from upstairs to the living room. The
> second robber told everybody in the living room to put their money on the table.

**United States District Court**
For the Northern District of California

Everybody took out everything they had and put it on the floor or the table. Truong gave up her earrings and two cell phones. Le gave up $60 and his watch. Eiw gave up a necklace and a watch. Nguyen gave up some money and keys. The third robber got a rice bag from the kitchen, gathered everything from the floor and table, and put it in the bag. The robber from upstairs came down yelling, "We're busted." All three of them then ran toward the kitchen. Truong and Eiw heard a gunshot and everybody in the house, including Nguyen, ran out the front door while the robbers ran out the back. One police officer was already out in front and others arrived later.

Officer Toshi Hata responded to the Dearwell Way area shortly after midnight, and was posted at an intersection about a block and a half away, near a park. Near 1:00 a.m., he observed Huynh walking toward a house. Hata made contact with Huynh and noticed that he was carrying a black jacket and was sweating heavily, disheveled, and had grass stains on his pants. Huynh said that he did not know anybody in the house but was going there to borrow a telephone. Hata searched Huynh for weapons, found none, and placed Huynh in his police car. Truong was brought to Hata's location and identified Huynh as being one of the robbers. Gunshot residue was later found on the right cuff of Huynh's jacket.

On October 20, 2000, the police contacted John T. at his school about the robbery. John told officer Paul Joseph that Huynh, [Jimmy] Cun, and [petitioner, Trung Vinh] Tran were involved with him in the robbery. At John's direction, Joseph drove John to Tran's apartment, where there was a white Mitsubishi parked outside. Tran was arrested shortly thereafter outside his apartment. Tran told Joseph that he had been involved in the robbery. He said that he was familiar with the people who lived at the house, and believed that illegal gambling went on there so that there would be a lot of money. He drove to the house in his white Mitsubishi. He received a call on his cell phone and then waited in his car. Sometime later he heard a gunshot and drove away. He received another call on his cell phone, stopped in the area of Highway 101 and Bernal, and then drove back to his apartment.

Cun was arrested the evening of October 20, 2000, after he left Nguyen's residence. He admitted to Sergeant David Hober that he had been involved in the robbery on Dearwell Way. He said that he went to the house in a white Mitsubishi. He ran into the house with a gun and said, "Where's the money[?]" He went upstairs where he found a man in the bathroom. He told the man to go sit with the others in the living room. After the victims' belongings were put in a rice bag, he ran to a back sliding glass door. A shot was fired and the door broke open. He ran out and jumped two fences. The gun dropped out of his waistband and he threw his mask away. He called somebody on one of the victims' cell phone, and a white Mitsubishi picked him up in the area of Highway 85 and Bernal Road. Cun said that he got the scratches on his forehead and his hand while running from the scene.

On November 3, 2000, Nguyen admitted to Sergeant Hober that he was at the Dearwell Way address on October 19. He said that he had borrowed Le's cell phone and made a telephone call approximately one-half hour before the robbery occurred. Nguyen was arrested after the interview.

At trial, John admitted being a member of Asian Gangsters for two years prior to October 19, 2000. On that date, he was 17 years old and was involved in the home invasion robbery on Dearwell Way with defendants. Huynh and Cun are also members of Asian Gangsters. John thought that Nguyen had been a member but that he "got out" before the robbery. Tran was not a member. John testified that there were about six members in the gang but there was no formal structure to the gang and no specific leaders.

2

On that evening John went to Tran's apartment with defendants.  There they devised a plan to rob the Dearwell Way house.  John understood that the house was a place for prostitution and gambling.  Nguyen was supposed to go into the house, call Tran on his cell phone, and tell the rest of them how many people were inside.  Tran was to drive Huynh, Cun and John to the house and back afterwards.  Huynh was to run into the house and Cun and John were to follow him.  They were to bring everybody in the house to the living room.

Nguyen drove his car to the house.  About ten or twenty minutes later, Tran drove a white Mitsubishi to the house with the others.  John found out from Huynh and Cun while in the car that they were going to use guns.  Tran received a call on his cell phone.  He asked how many people were in the house and then told the others in the car how many people were there.  Tran stayed in the car when Huynh went to knock on the front door and Cun and John went to hide behind a bush.  Cun and John put on ski masks.  When a man answered Huynh's knock, Huynh kicked the door and rushed in.  Huynh covered his face with a rag and pointed a gun at the man.  Cun and John rushed in after Huynh.  John and Huynh ran to the living room and Cun ran upstairs.

Cun brought Nguyen and a woman back downstairs to the living room.  Cun and Huynh told everybody at gunpoint to stay where they were.  Nguyen was treated as a victim.  Cun went upstairs to search for items, and John went into the kitchen to grab a bag.  He took a rice bag back to the living room.  Huynh told the victims to put all their jewelry and money on the table.  John picked up the jewelry and cash and put it all in the bag.

Cun and Huynh yelled, "Let's go."  They tried to leave through the back sliding glass door but it would not open.  Huynh fired his gun, shattering the glass.  Cun, Huynh, and John ran from the house through the door.  They jumped over the fence, went through another yard, and then jumped over a freeway wall.  John and Cun threw away the ski masks and Cun threw away the bag of property they had taken.  John lost sight of Huynh and did not see him again that night.  John and Cun ran along the freeway to an exit.  Cun used a cell phone taken from one of the victims and called Tran.  Tran picked them up and took them home.

On October 19, 2000, the Dearwell Way residence had three couches, a table, and a television set in the living room.  There were mattresses on the floor and a dining room table near the back sliding glass door.  There were a bed or mattresses on the floor and clothes hanging in the closets in the three bedrooms.  There were a washer, dryer, and laundry detergent boxes in the laundry room.  Officers also found suitcases, laundry baskets, and purses.  A .380 spent casing was found on the rug next to an overturned chair near the back door.  A ski mask and a gun were found outside the house.  An unspent 9 mm round was found in the gun.  DNA from saliva on the ski mask matched Cun's DNA.

Sergeant Hober testified on behalf of Nguyen that he went to the Dearwell Way address the afternoon of November 2, 2000.  Le was there along with four Asian females, one of whom was sitting on a couch in a towel.  Three of the females had no identification and did not provide Le with any kind of address.  INS officers came and took those three females with them.  In Hober's opinion, the house was partially used as a house of prostitution and the three women taken away did not live there.  The back sliding glass door of the house had not been repaired, and a mattress covered the doorway.  Hober saw KY jelly in a bedroom.  He searched a car in the garage and found Le's driver's license in it, with an address outside San Jose.  In the trunk of the car were approximately 500 condoms and three tubes of KY jelly.

Huynh testified in his own behalf that he knew that the Dearwell Way house was a "whorehouse" because he had been there before. On October 19, 2000, he was dropped off by a friend and was walking toward the house when he saw a police car and heard a shot. He then took off running and ended up in a park. He hid in some bushes, but later left to find a phone to call for a ride home. An officer stopped him as he was walking up to another house. Private investigator Kelly Whitney testified on behalf of Huynh that she photographed the Dearwell Way house on December 19, 2001. At the time, the house appeared uninhabited and the back sliding glass door was still broken.

### Gang Evidence

The parties stipulated that Nguyen is a member of Asian Gangsters. San Jose Police Officer Jason Ta testified as an expert that Asian Gangsters and Kings of the Night are two of several Vietnamese gangs in the San Jose area. Vietnamese gangs are primarily involved in armed assaults on rival gang members. Asian Gangsters, which has about 20 members, are also involved in robberies. In Ta's opinion, the home invasion robbery on October 19, 2000, was committed for the benefit of and in association with Asian Gangsters.

On May 21, 1999, at approximately 8:00 p.m., Officer Juan Ceballos received a report of a gun in a car at Oak Hill Cemetery. The individuals involved were visiting the grave of a recently deceased Asian Gangster. Ceballos field identified Huynh and Cun at the scene. At the time, Cun acknowledged membership in Asian Gangsters but Huynh did not.

Huynh was severely stabbed several times at the Café Quyen on January 14, 2000, after which Tran and two others took Huynh to the hospital for medical treatment. Police determined that several members of the Kings of the Night were involved in the stabbing. Kings of the Night and Asian Gangsters are rival gangs.

On May 4, 2000, John and Duy N., another member of Asian Gangsters, got into a fight with Vincent H. John had a sword with him that he intended to use, but did not. During the fight Vincent was slashed on the back with Duy's sword. Although Vincent was not in a gang, John admitted that he and Duy were involved in other fights that involved other Vietnamese gangs.

Resp. Exh. F, California Court of Appeal Opinion in People v. John Ngoc Huynh, et al., ("Cal. Ct. App. Opinion"), pp. 2-8.

At a jury trial in 2002 in Santa Clara County Superior Court, Tran was convicted of three counts of robbery of an inhabited dwelling while acting in concert and three counts of false imprisonment. Cal. Penal Code §§ 213(a)(1)(A), 236. He also was found to have committed the offenses for the benefit of a street gang, Cal. Penal Code § 186.22(b)(1), and to have discharged a firearm in conjunction with the robbery charges, Cal. Penal Code § 12022.53(b) & (c). Tran was sentenced on July 2, 2002 to a total of 46 years to life in prison.

Tran appealed. His conviction was affirmed by the California Court of Appeal with a

United States District Court
For the Northern District of California

1    sentence modification and his petition for review was denied by the California Supreme

2    Court.  Tran filed unsuccessful state habeas petitions before filing this action.

3         Tran's federal habeas petition alleged six claims for relief:  (1) the trial court violated

4    Tran's right to due process by refusing to instruct that a structure must be used as a sleeping

5    quarters with the intent to do so in the future in order to be an inhabited dwelling house, (2)

6    the conviction and sentence for the firearm charge (a) amounted to cruel and unusual

7    punishment and (b) were not supported by sufficient evidence, (3) the sentence enhancement

8    under California Penal Code § 12022.5 was not charged or proven, in violation of Tran's

9    right to due process, (4) trial counsel provided ineffective assistance in that he failed to

10   challenge the admissibility of Tran's alleged confession, failed to adequately investigate the

11   interrogation, and failed to file a motion to suppress, (5) trial counsel provided ineffective

12   assistance by pursuing a defense strategy of necessity instead of actual innocence and by

13   failing to adequately investigate before trial, (6) Tran's right to due process was violated

14   because his conviction was based on insufficient evidence in that witness John T.'s testimony

15   was not corroborated.

16        The court found the claims in the petition to be cognizable in a federal habeas action

17   and ordered respondent to show cause why the petition should not be granted.   Respondent

18   filed an answer and Tran filed a traverse.  The matter is ready for a decision on the merits of

19   the petition.

20                            **JURISDICTION AND VENUE**

21        This court has subject matter jurisdiction over this habeas action for relief under 28

22   U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the challenged

23   conviction occurred in Santa Clara County, California, within this judicial district.  28 U.S.C.

24   §§ 84, 2241(d).

25                                 **EXHAUSTION**

26        Prisoners in state custody who wish to challenge collaterally in federal habeas

27   proceedings either the fact or length of their confinement are required first to exhaust state

28   judicial remedies, either on direct appeal or through collateral proceedings, by presenting the

1    highest state court available with a fair opportunity to rule on the merits of each and every

2    claim they seek to raise in federal court.  <u>See</u> 28 U.S.C. § 2254(b), (c).  State court remedies

3    were exhausted for the claims in the petition.

**STANDARD OF REVIEW**

4

5         This court may entertain a petition for writ of habeas corpus "in behalf of a person in

6    custody pursuant to the judgment of a State court only on the ground that he is in custody in

7    violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

8    The petition may not be granted with respect to any claim that was adjudicated on the merits

9    in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that

10   was contrary to, or involved an unreasonable application of, clearly established Federal law,

11   as determined by the Supreme Court of the United States; or (2) resulted in a decision that

12   was based on an unreasonable determination of the facts in light of the evidence presented in

13   the State court proceeding."  28 U.S.C. § 2254(d).

14        "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state

15   court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of

16   law or if the state court decides a case differently than [the] Court has on a set of materially

17   indistinguishable facts."  <u>Williams v. Taylor</u>, 529 U.S. 362, 412-13 (2000).

18        "Under the 'unreasonable application' clause, a federal habeas court may grant the

19   writ if the state court identifies the correct governing legal principle from [the] Court's

20   decisions but unreasonably applies that principle to the facts of the prisoner's case."  <u>Id.</u> at

21   413.  "[A] federal habeas court may not issue the writ simply because that court concludes in

22   its independent judgment that the relevant state-court decision applied clearly established

23   federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."

24   <u>Id.</u> at 411.  A federal habeas court making the "unreasonable application" inquiry should ask

25   whether the state court's application of clearly established federal law was "objectively

26   unreasonable."  <u>Id.</u> at 409.

27

28

**United States District Court**
For the Northern District of California

**DISCUSSION**

A       Failure to Give Requested Jury Instruction on Inhabited Dwelling

Tran contends that his right to due process was violated by the trial court's refusal to give a pinpoint instruction requested by a co-defendant on the meaning of "inhabited dwelling house." He urges that, while the instruction given "was correct as far as it went, the trial court nonetheless should have also instructed the jury with the proposed instruction" offered by his co-defendant. Petition For Review, p. 13. That proposed instruction defined the term "inhabited dwelling house" as a place "a person with possessory rights uses . . . as sleeping quarters intending to continue to do so in the future." Id.; see RT 1147. The trial court refused to give this instruction.

Federal habeas relief is available when an erroneous jury instruction so infects the entire trial that the resulting conviction violates due process. See Estelle v. McGuire, 502 U.S. 62, 72 (1991). A defendant generally is entitled to have the jury instructed on his defense theory, but whether a constitutional violation has occurred in the failure to do so will depend on the evidence in the case and the overall instructions given to the jury. See Duckett v. Godinez, 67 F.3d 734, 745 (9th Cir. 1995), cert. denied, 517 U.S. 1158 (1996). There must be some evidence to support the instruction in order for there to be a duty to instruct. Id at 743.

Here, the trial court instructed the jury on the definition of robbery, and that every robbery of a person in an inhabited dwelling was first degree robbery. At the request of the prosecutor, the trial court also instructed, "'Inhabited dwelling house' means [¶] A structure where people ordinarily live and; [¶] Which is currently being used for dwelling purposes. [¶] An inhabited dwelling house need not be the victim's regular or primary living quarters." Cal. Ct. App. Opinion at 8. This language was taken from People v. Fond, 71 Cal. App. 4th 127, 130 (1990) and was similar to the standard burglary instruction that defined an inhabited dwelling house. See CALJIC 14.52 ("An inhabited dwelling house is a structure which is currently used as a dwelling whether occupied or not. It is inhabited although the occupants are temporarily absent.")

1    The California Court of Appeal determined that the instruction that was given defined

2  "inhabited dwelling house" in a manner consistent with California law.  Moreover, as the

3  state appellate court observed, the instruction requested by the defense was a misstatement of

4  California law:

5    In <u>People v. Hughes</u> (2002) 27 Cal. 4th 287, the defendant argued that there was
    insufficient evidence that the victim's apartment was an "inhabited dwelling" for
6    purposes of both first degree robbery and first degree burglary because the victim was
    in the process of moving her possessions to her boyfriend's home and had slept there
7    during the prior two weeks. (<u>Id</u>. at p. 354.)  In rejecting this argument our Supreme
    Court stated, "The use of a house as sleeping quarters is not determinative, but instead
8    is merely a circumstance used to determine whether a house is inhabited." (<u>Ibid</u>.;
    citing <u>Hernandez</u>, <u>supra</u>, 9 Cal. App. 4th at pp. 440-442.)

9
      The instruction given in this case properly defined "inhabited dwelling house"
10    as a "structure where people ordinarily live and . . . which is currently being used for
    dwelling purposes" (<i>Fond</i>, <i>supra</i>, 71 Cal. App. 4th at p. 130.)  <i>Defendants' requested
11    instruction would have grafted a "use as sleeping quarters" requirement onto the
    definition of "inhabited dwelling house" for purposes of first degree robbery.  There
12    is no such requirement</i>, although defendants were free to argue that it was a
    circumstance that the jury could consider.

13
14  Cal. Ct. App. Opinion at 10 (emphasis added).

15    The state court's interpretation of state law binds the federal court in a habeas corpus

16  action.  <u>Bradshaw v. Richey</u>, 546 U.S. 74, 76 (2005); <u>Hicks v. Feiock</u>, 485 U.S. 624, 629

17  (1988).  Because California law did not have the requirement that an inhabited dwelling be

18  used as sleeping quarters, it follows that there was no constitutional error in not instructing

19  that such a requirement existed.  Tran thus fails show any error in the trial court's instruction

20  of the jury, let alone an error that so infected the trial as to make it fundamentally unfair.  The

21  state appellate court's rejection of this claim was not contrary to, or an unreasonable

22  application of, clearly established Supreme Court authority.

23  B.    <u>Challenges To The Sufficiency Of the Evidence</u>

24    Tran claims that the conviction and sentence for the firearm and gang charges were

25  not supported by sufficient evidence.  He also claims that the evidence was insufficient

26  because it was based on an accomplice's testimony.

27    Before turning to the federal constitutional claims, it is necessary to explain how

28  Tran's 46-to-life sentence was calculated.  Tran did not personally use a firearm during the

robbery, but has liability because one of the other principals did use a firearm.  The normal sentencing triad for a robbery of an inhabited dwelling while acting in concert is 3, 6 or 9 years in prison.  Cal. Penal Code § 213(a)(1)(A).  When that offense is committed "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members," the specified term is an indeterminate term of life imprisonment.  Cal. Penal Code § 186.22(b)(4)(B).  When, as here, "the defendant is charged as a principal in the offense and another principal discharges a firearm in the commission of the offense, the specified term is an indeterminate life term with a minimum confinement time calculated by adding the determinate term for the underlying conviction to 20 years."  Cal. Ct. App. Opinion at 13, citing Cal. Penal Code §§ 186.22(b)(4)(A), 12022.53(c) & (e)(1).   For Tran, the court selected the middle term of 6 years on the first degree robbery, and added 20 years to the term, resulting in an indeterminate life sentence with a 26-year minimum.  The court then added a consecutive 20-year term under § 12022.53 for the use of the firearm by a principal.  See CT 1223-1224.

Tran argued on appeal that he could not receive enhancements under both California Penal Code § 186.22 and § 12022.53.  The state court of appeal determined that the § 186.22 provision was not a sentence "enhancement" under state law and therefore rejected Tran's claim that he could not be subjected to both § 186.22 and § 12022.53.  Cal. Ct. App. Opinion at 14; see also Robert L. v. Superior Court, 30 Cal. 4th 894 (Cal. 2003) (§ 186.22(d) is an alternate penalty provision and not a sentence enhancement or substantive offense).  The state court's interpretation of state law binds a federal court in a habeas corpus action.  Bradshaw v. Richey, 546 U.S. at 76; Hicks v. Feiock, 485 U.S. at 629.  Therefore, this court does not revisit the correctness of the sentence calculation, and instead moves on to consider Tran's related claims about the sufficiency of the evidence to support the sentences imposed.

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  In re Winship, 397 U.S. 358, 364 (1970).  A federal court reviewing collaterally a

1    state court conviction does not determine whether it is satisfied that the evidence established

2    guilt beyond a reasonable doubt, but rather determines whether, "after viewing the evidence

3    in the light most favorable to the prosecution, any rational trier of fact could have found the

4    essential elements of the crime beyond a reasonable doubt.'" Jackson v. Virginia, 443 U.S.

5    307, 319 (1979); see Payne v. Borg, 982 F.2d 335, 338 (9th Cir. 1992), cert. denied, 510 U.S.

6    843 (1993).  Only if no rational trier of fact could have found proof of guilt beyond a

7    reasonable doubt may the writ be granted.  See Jackson, 443 U.S. at 324; Payne, 982 F.2d at

8    338.  Under § 2254(d), a federal habeas court applies the standards of Jackson with an

9    additional layer of deference. Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005), cert.

10    denied, 546 U.S. 1137 (2006).  Generally, a federal habeas court must ask whether the state

11    court decision reflected an unreasonable application of Jackson and Winship to the facts of

12    the case.  Id. at 1275.

13         1.    The Firearm Enhancement

14         There was sufficient evidence to support the firearm enhancement under § 12022.53.

15    Section 12022.53(c) provides for a 20-year sentence enhancement for any person who

16    "personally and intentionally discharges a firearm" in a robbery or other listed felony.  The

17    enhancement applies if it is pled and proven that the person violated § 186.22(b) and "[a]ny

18    principal in the offense committed any act specified in subdivision (b), (c) or (d)."  Cal. Penal

19    Code § 12022.53(e)(1).  Although Tran did not personally use a gun during the robbery, the

20    interplay of subsections (c) and (e) of § 12022.53 caused the section to apply to him because

21    he was a principal in the robbery and another principal (i.e., John Huynh) fired a gun during

22    the course of the robbery.

23         The evidence was sufficient to establish that John Huynh personally and intentionally

24    discharged a firearm during the robbery.  John T. testified that the robbery started with John

25    Huynh rushing in after the house door was opened; Huynh covered his face with a rag "and

26    pointed the gun at the guy."  RT 304.  John T. also testified that as the robbers attempted to

27    exit when they thought the police had arrived, a glass door wouldn't open and Huynh "fired

28    the gun at the window, so it shattered."  RT 315.  During the investigation, the police found a

1   spent casing left over from a gun being shot near the broken window. RT 450. Since there

2   was sufficient evidence that co-principal Huynh personally and intentionally discharged a

3   firearm, co-principal Tran could be liable also under § 12022.53. The application of §

4   12022.53 to Tran did not offend due process.

5           This analysis also disposes of Tran's argument that he was denied his right to a jury

6   trial in that the "jury should have been able to consider the fact petitioner was never armed,

7   of [sic] in possession of a firearm." Petition, attachments (habeas petition in Cal. Supreme

8   Court, p. 14). His argument misunderstands the law vis-a-vis his liability: his personal

9   possession of a firearm was not necessary for the enhancement to apply and his liability was

10  based on Huynh's possession and use of a firearm, which the jury did find to be true. <u>See</u> CT

11  1076, 1106. Tran had no right to have the jury find a fact that was not necessary to the

12  imposition of enhancement.

13          2.      <u>The Gang Crime Sentence</u>

14          Tran was sentenced under a gang crime statute that involves a harsh sentencing

15  scheme for a "person who is convicted of a felony committed for the benefit of, at the

16  direction of, or in association with any criminal street gang, with the specific intent to

17  promote, further, or assist in any criminal conduct by gang members." Cal. Penal Code §

18  186.22(b)(1); CALJIC 17.24.2; CT 1038. Specifically, Tran contends there was not enough

19  evidence that the Asian Gangsters were a criminal street gang as defined in § 186.22 or that

20  the crimes were done at the direction of or in association with a criminal street gang.

21          A "criminal street gang" was defined as meaning "any ongoing organization,

22  association, or group of three or more persons, whether formal or informal, (1) having as one

23  of its primary activities the commission of one or more of the following acts: assault with

24  deadly weapon, assault likely to produce great bodily injury, and robbery, (2) having a

25  common name or common identifying sign or symbol and (3) whose members individually

26  or collectively engage in or have engaged in a pattern of criminal activity." CT 1038;

27  CALJIC 17.24.2. The court also instructed the jury that either "prior conduct or acts

28  committed at the time of the charged offenses can be used to establish the 'primary activities'

element."  CT 1041.

There was sufficient evidence that Asian Gangsters ("AG") was a criminal street gang. San Jose police officer Jason Ta testified as an expert on Asian gangs and identified AG and Kings of the Night as two of the local Vietnamese gangs.  RT 887.  Although it was informal in nature and had no geographic boundaries or clubhouse, AG met the commonality requirement in that it had a name, i.e., Asian Gangsters, and to a lesser extent had some symbols in that some members other than Tran had AG tattooed on themselves and made "A" and "G" hand signs.  RT 965-966; see RT 361, 391.  AG had more than the requisite three members, as it had about 20-25 members (according to Ta), RT 898-899, or six members (according to John T.), RT 325.  AG also met the primary activities requirement, as there was evidence of a May 2000 attack by two AG members with a sword on a rival gang member, RT 890-891, during which the latter was slashed with the sword.  That was identified by the gang expert as a gang-related crime committed for the benefit of or in association with, or at the direction of AG.  See RT 891, 892.   In addition to that sword incident, the current home invasion robbery showed a pattern of criminal activity.  The gang expert opined that Vietnamese gangs in general were "the most brutal of gangs;" their assaults were typically very serious assaults with machetes, knives or guns; and their assaults typically were directed at rival gang members.  RT 894.  The gang expert then addressed AG in particular, i.e., that its primary activities were "assaults, just primarily fighting."  RT 895.  The gang expert also opined that AG also was involved in robberies.  RT 896.  Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that the primary activities requirement was met.  Specifically, the trier of fact rationally could have concluded that the AG's assaults were assaults with deadly weapons or assaults likely to produce great bodily injury.  Since AG was a Vietnamese gang, the general statement that Vietnamese gangs were involved in brutal armed attacks on rival gang members could be understood to modify the kind of assaults that AG did, such that a rational trier of fact could conclude that AG members engaged in assaults with deadly weapons and/or assaults likely to produce great bodily injury.

United States District Court
For the Northern District of California

1    There also was sufficient evidence that the home invasion robbery was committed for

2   the benefit of, at the direction of, or in association with AG.  John T. testified that the crime

3   was committed by a group that included three gang members (him, Huynh and Cun), a

4   former member of AG (Tan Van Nguyen), and an associate of AG (Tran).  RT 284-290, 903-

5   904.  John T. expected that they all would share the proceeds.  RT 312.  Officer Ta explained

6   how the crime was committed for the benefit of and in association with AG.  RT 905-906.

7   According to him, AG would benefit monetarily and would gain status/reputation with other

8   rival gangs and have an advantage in getting new members; also, AG's members who

9   committed the crime would gain clout within the gang because they would be perceived as

10   more "hard core."  RT 905-908, 967-68.   Officer Ta also opined that Tran committed this

11   offense in association with AG.  RT 913.

12    Respondent incorrectly asserts that both John T. and officer Ta identified Tran as a

13   member of AG.  Compare Resp. Memo. of P&As, p. 11 with RT 351, 903-904.

14   Respondent's mistaken assertion does not affect the outcome, as it was not necessary that

15   Tran be a member of AG to have the alternate penalty provision of § 186.22 applied to him.

16          3.      Sufficiency Of The Evidence - Accomplice Testimony

17    Tran claims that his right to due process was violated because his conviction was

18   based on insufficient evidence in that John T. was an accomplice and his testimony was not

19   corroborated.

20    Under California law, a conviction may not be based on the testimony of an

21   accomplice unless it is corroborated by other evidence connecting the defendant with the

22   commission of crime.  Cal. Evid. Code § 1111.  Whether the evidence satisfied California

23   Evidence Code § 1111 is largely beside the point here because a federal habeas court cannot

24   grant relief based on a violation of state law.  See Laboa v. Calderon, 224 F.3d 972, 979 (9th

25   Cir. 2000); see also Estelle v. McGuire, 502 U.S. 62, 68 (1991); Walters v. Maass, 45 F.3d

26   1355, 1357 (9th Cir. 1995).  The federal due process standard is less stringent than California

27   Evidence Code § 1111.  Under federal law, "uncorroborated testimony of an accomplice is

28   sufficient to sustain a conviction unless it is incredible or insubstantial on its face."  United

States v. Necoechea, 986 F.2d 1273, 1282 (9th Cir. 1993) (emphasis added).  Indeed, the U.S. Supreme Court recognized long ago that "there is no absolute rule of law preventing convictions on the testimony of accomplices if juries believe them."  Caminetti v. United States, 242 U.S. 470, 495 (1917).

Basing Tran's conviction on uncorroborated testimony by John T. would have violated federal due process only if John T. was shown to be an accomplice and his testimony was incredible or insubstantial on its face.   Tran comes nowhere close to showing that John T.'s testimony was incredible or insubstantial.

Laboa identified a separate way a claim of constitutional dimension could exist:  if the state violated the defendant's due process right to fundamental fairness by arbitrarily depriving him of a state law entitlement.  Laboa, 224 F.3d at 979.  Tran does not appear to make such a claim, but even if he had raised it, he would not prevail.  If corroboration was constitutionally required for John T.'s testimony, it existed.  John T.'s description of the evening's events was corroborated by the following: John T.'s testimony about Tan Van Nguyen going to the house ahead of the rest of the group to report back on the number of people in the house was corroborated by Nguyen and Nguyen's car being found at the house. John T.'s description of the robbery was corroborated by the statements the victims gave to the police.  John T.'s description of the gun shot being fired by John Huynh was corroborated by the shell casing, the shattered window at the house, and the gun residue on Huynh's clothes.  John T.'s description of Tran driving them to the scene was, in a way corroborated by the fact that no vehicle that had transported John T., Huynh and Cun was found at the house and by the fact that they escaped without being apprehended even though police arrived at the scene quickly.  This evidence was sufficient corroboration because, although it did "'not corroborate every fact to which the accomplice testified . . . it tend[ed] to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice [was] telling the truth.'"  Id., quoting People v. Fauber, 2 Cal. 4th 792 (Cal. 1992).  And, of course, Tran's own admissions to the police provided the strongest corroboration for John T.'s statements.  RT 673-675.

United States District Court
For the Northern District of California

1    Tran has not shown that the state court's rejection of the federal constitutional claims

2    in his challenges to the sufficiency of the evidence was contrary to or an unreasonable

3    application of clearly established Supreme Court authority.  The due process claims are

4    denied.

5    C.    <u>Cruel And Unusual Punishment Claim</u>

6          Tran contends his 46-to-life sentence amounts to cruel and unusual punishment.  The

7    nub of his argument appears to be that the sentence is excessive because he was only the

8    driver and never entered the house or carried a gun.

9          A criminal sentence that is significantly disproportionate to the crime for which the

10   defendant was convicted violates the Eighth Amendment's prohibition of cruel and unusual

11   punishment.  <u>See</u> <u>Solem v. Helm</u>, 463 U.S. 277, 303 (1983) (sentence of life imprisonment

12   without possibility of parole for seventh nonviolent felony violates Eighth Amendment).

13   "[O]utside the context of capital punishment, <u>successful</u> challenges to the proportionality of

14   particular sentences will be exceedingly rare."  <u>Id.</u> at 289-90 (citation and quotation marks

15   omitted).  "'The Eighth Amendment does not require strict proportionality between crime and

16   sentence.  Rather, it forbids only extreme sentences that are "grossly disproportionate" to the

17   crime.'"  <u>Ewing v. California</u>, 538 U.S. 11, 23 (2003) (quoting <u>Harmelin v. Michigan</u>, 501

18   U.S. 957, 1001 (1991) (Kennedy, J., concurring)).  Under this proportionality principle, the

19   threshold determination for the court is whether petitioner's sentence is one of the rare cases

20   in which a comparison of the crime committed and the sentence imposed leads to an

21   inference of gross disproportionality.  <u>Harmelin</u>, 501 U.S. at 1005; <u>Ewing</u>, 539 U.S. at 30-31

22   (applying <u>Harmelin</u> standard).  Only if such an inference arises does the court proceed to

23   compare petitioner's sentence with sentences in the same and other jurisdictions.  <u>See</u>

24   <u>Harmelin</u>, 501 U.S. at 1005; <u>cf.</u> <u>Ewing</u>, 538 U.S. at 23.  The threshold for an "inference of

25   gross disproportionality" is quite high.  <u>See, e.g.</u>, <u>Ewing</u>, 538 U.S. at 30 (sentence of 25 years

26   to life for conviction of grand theft with prior convictions was not grossly disproportionate);

27   <u>Lockyer v. Andrade</u>, 538 U.S. 63 (2003) (upholding two consecutive 25-to-life terms for two

28   convictions of theft of videotapes with prior convictions); <u>Harmelin</u>, 501 U.S. at 1008-09

**United States District Court**
For the Northern District of California

1    (mandatory sentence of life without possibility of parole for first offense of possession of 672

2    grams of cocaine did not raise inference of gross disproportionality).

3       <u>Andrade</u> and <u>Ewing</u> are the Supreme Court's most recent pronouncements on Eighth

4    Amendment claims regarding prison sentences and both upheld California Three Strikes

5    sentences for shoplifters with prior convictions.  Although these cases involved recidivist

6    criminal defendants, they apply to all prison sentences.  One of the important lessons from

7    these two cases is that relief under the Eighth Amendment continues to be reserved for the

8    extreme and grossly disproportionate sentences.

9       Tran's argument that his involvement in the criminal episode was limited does not

10   help him.  Under state law, he was a principal in the crime under California's familiar rule

11   that divides parties to a crime into principals and accessories.  California treats all principals

12   as principals, regardless of whether they directly commit the act "or aid and abet in its

13   commission, or, not being present, have advised and encouraged its commission."  Cal. Penal

14   Code § 31.  Therefore, even if Tran's particular role in the crime required him to wait in the

15   car, Tran can be liable as a principal under state law.  Further, although he endeavors in his

16   legal brief to minimize his role, the evidence shows that Tran was substantially involved in

17   the robbery: he took part in the planning discussions, drove the intruders to the victims'

18   house, relayed the information to the intruders from a phone call by a confederate in the

19   house informing them how many people were in the house, was to wait outside to drive the

20   get-away car, and did pick up two of the fleeing robbers after the robbery.

21       Tran's particular actions in this armed robbery generally are constitutionally irrelevant.

22   The Supreme Court has not held that a court must consider the defendant's individual

23   activities in a crime or any other mitigating factor in determining whether a prison sentence

24   is constitutionally permissible.  Indeed, Supreme Court sentiment seems to be to the contrary.

25   A majority of the <u>Harmelin</u> court rejected the contention that the Eighth Amendment requires

26   a judge to consider mitigating factors before sentencing a convicted criminal to life

27   imprisonment without the possibility of parole, thereby declining to extend the

28   "individualized capital-sentencing doctrine" to non-capital cases.  <u>See</u> <u>Harmelin v. Michigan</u>,

501 U.S. at 994-996; <u>United States v. Gomez</u>, 472 F.3d 671, 674 (9th Cir. 2006) (<u>Harmelin</u> does not apply to challenge to non-capital sentencing law); <u>Alvarado v. Hill</u>, 252 F.3d 1066, 1069 (9th Cir. 2001) (same).  Tran's sentence is analyzed at the general level, i.e., whether 46-to-life is permissible for an armed robbery in a home in which a gun was used.  That sentence for that crime does not amount to cruel and unusual punishment.  His is not that "rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality." <u>Ewing</u>, 538 U.S. at 30 (quoting <u>Harmelin</u>, 501 U.S. at 1005).  Tran is not entitled to the writ on his Eighth Amendment claim.

D.      <u>Sentence Enhancement Under Cal. Penal Code § 12022.5</u>

Tran contended in his petition that the sentence enhancement under California Penal Code § 12022.5 was not charged or proven, in violation of his right to due process. Respondent argued that the state court of appeal had modified the sentence to address this concern.  Tran conceded this issue in his traverse.  Traverse, p. 15.  The claim  therefore is denied.

E.      <u>Ineffective Assistance of Counsel Claims</u>

Tran claims that trial counsel provided ineffective assistance in that he failed to challenge the admissibility of Tran's alleged confession, failed to adequately investigate the confession, and failed to file a motion to suppress that confession.  He also alleges that trial counsel provided ineffective assistance by pursuing a defense strategy of necessity instead of actual innocence and by failing to adequately investigate before trial.

The Sixth Amendment to the U.S. Constitution guarantees not only assistance, but effective assistance, of counsel.  <u>See</u> <u>Strickland v. Washington</u>, 466 U.S. 668, 686 (1984). The purpose of the right is to ensure a fair trial, and the benchmark for judging any claim of ineffectiveness is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result." <u>See</u> <u>id.</u>  To prevail on an ineffective assistance of counsel claim, a habeas petitioner must show that (1) counsel's performance was "deficient," i.e., his "representation fell below an objective standard of reasonableness" under prevailing professional norms, <u>id.</u> at 687-88, and

17

United States District Court
For the Northern District of California

(2) prejudice flowed from counsel's performance, i.e., that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different, see id. at 691-94.

Tran's first ineffective assistance claim concerns an alleged failure to take various steps to challenge his confession to the police.  The court did hold a hearing under California Evidence Code to determine the admissibility of Detective Paul Joseph's report on Tran's confession.  RT 59-100.  During that hearing, the attorneys inquired into the circumstances of the interrogation and focused on whether Miranda warnings were given.  During that hearing, Tran's attorney elicited the following information from Detective Joseph: the detective did not have Tran sign a written Miranda advisement form and had given the advisement orally, RT 83-84; the detective had not videotaped or audiotaped the interview, RT 87; the detective had made notes but destroyed them after he reduced the information to a report, RT 88; and the detective had made reference in his report to a supplemental report by sergeant Pomeroy, but did not have it and did not recall if he had read it, RT 90.   After hearing the detective's testimony at the § 402 hearing, the court granted the prosecutor's motion to admit the statements and made the finding "that the Mirandas were properly given and that the defendant freely, voluntarily, knowingly waived them."  RT 100.

The trial court's determination that the Miranda warnings were properly given and that Tran knowingly waived the Miranda rights is entitled to a presumption of correctness under 28 U.S.C. § 2254(d).  See Thompson v. Keohane, 516 U.S. 99, 107-110 & n.9 (1995); Derrick v. Peterson, 924 F.2d 813, 820-24 (9th Cir. 190), cert. denied, 502 U.S. 853 (1991). Tran's statement that he demanded counsel and remained silent does not overcome the presumption of correctness.  The trial court's determination of the voluntariness is not a factual determination that is entitled to the presumption of correctness and instead is a mixed question of law and fact requiring independent federal review, see Derrick, 924 F.2d at 921-22, however, Tran has not challenged the voluntariness of his statement.

Tran faults his counsel for failing to challenge the confession by filing a motion to suppress the confession but fails to show any prejudice.  Even if his attorney did not file a

18

United States District Court
For the Northern District of California

motion to suppress, the prosecutor filed a motion for a preliminary ruling that required the court to decide the question of whether the confession was admissible – i.e., the same question that would have been presented if defense counsel had moved to suppress the confession.  The court made a ruling adverse to Tran.  Tran does not show how the trial court's ruling on the admissibility of the confession would have changed had the admissibility been challenged by a defense motion to suppress rather than a prosecution motion to admit the confession.  Cf. Rupe v. Wood, 93 F.3d 1434, 1445 (9th Cir. 1996), cert. denied, 519 U.S. 1142 (1997) (failure to take futile action can never be deficient performance).  There also is no reasonable probability that, but for defense counsel's failure to move to suppress the confession, the result of the proceedings would have been different.  Tran also faults counsel for failing to adequately investigate the circumstances of the confession, but has not shown what information counsel would have found had he further investigated the circumstances of the confession other than the information counsel did elicit at the hearing regarding the lack of a signed waiver, the lack of a recording, the destruction of the detective's original notes, and the doubt about the existence of a supplemental report by sergeant Pomeroy referred to by the detective.   Although these problems might have go the weight to be given the confession or to the detective's credibility, they did not make his report of Tran's confession inadmissible.

Tran also claims that counsel was ineffective for failing to investigate information from Tran which would have demonstrated "he could not have possibly been involved in the crime" due to two broken arms and a broken right hand that would have made it impossible for him to drive a stick shift getaway car.  He argues that counsel should have put on an actual innocence defense based on that evidence.  State habeas petition, p. 22.  He has failed to show deficient performance or resulting prejudice on this claim.

Tran's evidence is far from conclusive that he could not have been involved in the crime.  Assuming arguendo the medical records he submitted with his traverse are authentic, they indicate that a week before the robbery he went to a San Jose hospital emergency room for treatment after a motorcycle accident.  He walked in several hours after the accident and

United States District Court
For the Northern District of California

after noticing increasing pain in his elbows and right hand.  He denied any other injuries.  The doctor's report stated that his exam found that Tran had a full range of motion in his shoulders and wrists within normal range of motion, but Tran did have a swollen right elbow from a right radial head fracture, abrasions on the palms of both hands, and a fractured fifth metacarpal.  The treatment plan included (1) a tetanus shot and pain medication, (2) cleaning of the abrasions on his hands, (3) placement of a right upper extremity splint, and (4) follow up with an orthopedic clinic.  Traverse, Exhs. at A-29 - A-30.   These records do not show an injury so severe that they make a persuasive case of a person unable to drive a car a week later.  Tran argues that his car was a stick shift, but offers no evidence of that fact.  Even assuming his car had a stick shift, he does not establish that his elbow injury prevented him from driving it a week after the splint was applied.  Nor does he show how a broken pinkie finger would preclude the operation of a car or a stick shift in a car.  He also does not offer any record from any third party (or even submit his own declaration) to show that he was wearing a cast or splint or that his arm was immobilized a week after the hospital visit when the robbery occurred or the next day when he was arrested.  (For example, if an arrestee arrived at jail with an arm in a splint or an arm that could not be handcuffed in normal fashion, one would expect that there would be a jail intake record noting that.)  In addition, one must also bear in mind the extensive evidence contrary to Tran's argument that he was unable to drive: a neighbor saw a white Mitsubishi speeding down the street at about the time of the gunshot during the robbery, a white Mitsubishi (which apparently was Tran's car) was found at Tran's home when he was arrested the next day, John T. identified Tran as the driver in his confession to police the day after the robbery, Jimmy Cun identified Tran as the driver in his confession to police, and Tran confessed to police that he was the driver.  With this state of the evidence, it can be said with certainty that there is no reasonable probability the result of the proceedings would have been different if defense counsel presented an actual innocence defense based on Tran's physical inability to drive the getaway car.

The state court's rejection of the ineffective assistance of counsel claims was not contrary to or an unreasonable application of clearly established federal law, as determined

by the U.S. Supreme Court.  Tran is not entitled to the writ.

## CONCLUSION

The petition for writ of habeas corpus is DENIED on the merits.  The clerk shall close the file.

IT IS SO ORDERED.

DATED:   September 24, 2008

_____
Marilyn Hall Patel
United States District Judge

United States District Court
For the Northern District of California

21